**Corrected**

# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0406V
UNPUBLISHED

| | |
|---|---|
| ERIC FELLAND,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: September 6, 2022<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Leah VaSahnja Durant*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.

*Emilie Williams*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On April 8, 2020, Eric Felland filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged the Table claim that he suffered a shoulder injury related to vaccine administration ("SIRVA") after receiving the influenza vaccine on October 31, 2018. Petition at 1, ¶¶ 1, 10. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). Although a ruling on entitlement in Petitioner's favor was issued in August 2021, the parties have been unable to resolve damages on their own.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount **$101,352.70**, **representing $100,000.00 for actual pain and suffering, plus $1,352.70 for actual expenses.**

## I. Relevant Procedural History

Within a month of filing his petition, Mr. Felland filed the medical records and signed declaration[3] required under the Vaccine Act. Exhibits 1-12, filed Apr. 20, 2020, ECF No. 6; *see* Section 11(c). On April 21, 2020, the case was activated and assigned to the SPU (OSM's adjudicatory system for attempting to resolve cases deemed likely to settle). ECF No. 8.

On several occasions thereafter, Petitioner filed updated medical records. Exhibit 13, filed July 20, 2020, ECF No. 12; Exhibits 14-16, filed Nov. 24, 2020, ECF No. 16. On November 24, 2020, Petitioner also conveyed a demand and supporting documentation to Respondent. ECF No. 17.

On August 6, 2021, Respondent filed his Rule 4(c) Report conceding Petitioner was entitled to compensation, and I issued a Ruling on Entitlement two days later. ECF Nos. 22-23. For approximately eight months thereafter, the parties attempted to informally resolve the issue of damages. *See, e.g.*, Status Report, filed Mar. 11, 2022, ECF No. 33. On April 11, 2022, they informed me they had reached an impasse in their damages discussions. ECF No. 34.

During the subsequent five-month period, the parties filed their damages briefs, and Petitioner filed a supplemental signed declaration. Petitioner's Brief on Damages ("Brief"), filed June 30, 2022, ECF No. 37; Exhibit 17, filed July 1, 2022, ECF No. 38; Respondent's Response to Petitioner's Brief in Support of Damages ("Opp."), Aug. 23, 2022, ECF No. 41. The matter is now ripe for adjudication.

## II. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury,

---

[3] Petitioner's declaration is signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exhibit 11.

and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, Judge Merow

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

### III.   Prior SIRVA Compensation Within SPU[5]

#### A.   Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2022, 2,723 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,651 of these cases, with the remaining 72 cases dismissed.

Of the compensated cases, 1,513 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 114 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[6]

1,371 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (emphasis in original).

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

The remaining 1,138 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[7] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *114* | *1,371* | *28* | *1,138* |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $72,354.81 | $67,472.00 | $90,000.00 | $40,000.00 |
| **Median** | **$102,479.12** | **$86,927.85** | **$122,886.42** | **$60,000.00** |
| **3rd Quartile** | $125,343.45 | $115,000.00 | $161,001.79 | $115,000.00 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.  Pain and Suffering Awards in Reasoned Decisions

In the 114 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $100,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[8]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed

---

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

5

evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). Only one required surgery. Except in one case with an award for pain and suffering slightly below the median amount, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions, a PT duration of more than three years, and multiple cortisone injections, were required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### IV.     The Parties' Arguments

The parties agree Petitioner should be awarded $1,352.70 for past unreimbursed expenses. Brief at 6, 6 n.1; Opp. at 7 n.3. Thus, the only area of disagreement is the amount of compensation which should be awarded for Petitioner's pain and suffering. Petitioner seeks $130,000.00 for his pain and suffering, and Respondent argues for an award of $90,000.00. Brief at 6; Opp. at 2, 7.

The parties' primary disagreements involve the duration of Petitioner's SIRVA injury and severity of his pain. Although he acknowledges significant improvement following surgery, Petitioner maintains that he continued to experience "considerable pain and need[ed] treatment for a long time after surgery." Brief at 8. He asserts that "[n]ow almost four years after his injury, [he] has continued to experience substantial pain and discomfort when using his arm, and he is still unable to use his arm as fully as he did before his vaccination injury." *Id.*; *accord. id.* at 11.

Regarding the severity of his injury, Petitioner describes severe pain which continued unabated. Brief at 9. He characterizes his treatment as extensive and unsuccessful – consisting of at-home PT exercises and two cortisone injections prior to surgery, 17 post-surgical PT sessions, and two MRIs. *Id.* at 9-10. Petitioner maintains

6

that his shoulder injury continues to cause him anxiety, to affect his daily activities such as his ability to exercise, and to influence his future medical decisions – all due to his fear of needles. *Id.* at 9-11.

In response, Respondent insists that Petitioner "never demonstrated significant pain or significant reduction in his range of motion prior to electing surgical intervention." Opp. at 8. Noting that Petitioner "did not participate in formal PT prior to electing surgical intervention," Respondent maintains that, based on the results of Petitioner's initial MRI, the first orthopedic surgeon Petitioner saw opined that surgery was not needed. *Id.* at 7-8. Emphasizing the "steady improvement" Petitioner experienced during six weeks of post-surgical PT, his discharge from PT thereafter – less than one-year post-vaccination - and gap in treatment thereafter, Respondent characterizes Petitioner's shoulder injury as "limited, despite surgical intervention." *Id.* at 8.

Petitioner favorably compares the facts and circumstances of his SIRVA injury with those suffered by the petitioners in *Nute* and *Rafferty*, who received pain and suffering awards ranging from $125,000.00 to $127,500.00, respectively.[9] Brief at 11-13. Citing significant post-surgical improvement obtained by those petitioners, Petitioner argues that his pain and suffering award should be greater. *Id.* at 12. He also maintains his award should be greater than five additional surgical cases featuring awards of $125,00.00,[10] but does not discuss the facts of those cases in detail. Brief at 12-13.

Emphasizing the more significant limitations in ROM, formal treatment, and worsening symptoms experienced by the *Nute* and *Rafferty* petitioners prior to surgery, as well as longer duration of treatment required for the *Rafferty* petitioner post-surgery, Respondent argues that Petitioner's pain and suffering was less. Opp. at 8-9. He adds that Petitioner's anxiety is not documented in the medical records. *Id.* at 9. Instead, Respondent asserts that the *Shelton, Weed,* and *Hunt* cases, involving pain and suffering awards ranging from $95,000.00 to $105,000.00,[11] provide better comparisons to Petitioner's SIRVA injury. Opp. at 9-11.

---

[9] *Nute v. Sec'y of Health & Hum. Servs.,* No. 18-0140V, 2019 WL 61250008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019); *Rafferty v. Sec'y of Health & Hum. Servs.,* No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020).

[10] *Wallace v. Sec'y of Health & Hum. Servs.,* No. 16-1472V, 2019 WL 4458393 (Fed. Cl. Spec. Mstr. June 27, 2019); *Dobbins v. Sec'y of Health & Hum. Servs.,* No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018); *Roberson v. Sec'y of Health & Hum. Servs.,* No. 19-0090V, 2020 WL 5512542 (Fed. Cl. Spec. Mstr. Aug. 7, 2020); *Stokes v. Sec'y of Health & Hum. Servs.,* No. 19-0752V, 2021 WL 6550888 (Fed. Cl. Spec. Mstr. Dec. 17, 2021); *Drake v. Sec'y of Health & Hum. Servs.,* No. 18-17476V, 2020 WL 4674105 (Fed. Cl. Spec. Mstr. July 7, 2020).

[11] *Shelton v. Sec'y of Health & Hum. Servs.,* No. 19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021); *Weed v. Sec'y of Health & Hum. Servs.,* No. 18-1473V, 2021 WL 1711800 (Fed. Cl. Spec. Mstr.

In addition, Respondent maintains that any pain and suffering calculation should be based upon Respondent's assessment of the full value of damages in a case – as reflected in his proffer. Opp. at 7. He argues that any deviation from this amount encourages petitioners to decline Respondent's full value proffers, and instead demand damages briefing – creating more work for the Court and Respondent, and unreasonably driving up the amount of attorney's fees reimbursed by the Vaccine Program. *Id.*

## V.     Appropriate Compensation for Petitioner's Pain and Suffering

### A.     General Guidance for Analysis

I previously have rejected Respondent's argument that the amounts awarded in proffered cases are a more accurate gauge of the appropriate amount to be awarded than reasoned decisions from the court and special masters. *Sakovits*, 2020 WL 3729420, at *4. While "settled cases and proffers provide *some* evidence of the kinds of awards received overall in comparable cases," they are not as persuasive as reasoned decisions from a judicial neutral. *Id.* (emphasis in original). Of course, the data from these decisions can be a helpful gauge of the compensation being awarded in SPU SIRVA cases, even if it is ultimately of less utility than a settled case outcome.[12]

### B.     Specific Analysis

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and

---

Mar. 30, 2021); *Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022).

[12] I also note that Respondent diminishes the persuasiveness of his assertion regarding the accuracy of proffered awards when (as in this case) he routinely suggests comparable cases then proposes a *lower* pain and suffering award. I understand generally that both sides have their own biases in the outcomes they favor; certainly petitioners have a clear motivation to seek greater pain and suffering awards. But since a proffer reflects Respondent's take on damages, it is likely to be somewhat consistent with Respondent's goals of protecting the Vaccine Fund, as well as Respondent's larger inclination to favor lower awards. This again underscores why reasoned and non-partial decisions from the special masters are the best guidance in evaluating these kinds of questions.

non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the medical records reveals that Mr. Felland, a 31-year-old credit analyst with two young children, suffered a relatively mild SIRVA injury, with lower pain levels and slightly limited ROM, for approximately one year. Prior to surgery – performed approximately eight months post-vaccination - Petitioner followed a home exercise program ("HEP"), treated with over-the-counter pain medication, and underwent two steroid injections. However, he declined attending PT.

When Petitioner, first sought treatment for his left shoulder pain, from his primary care provider ("PCP") on December 4, 2018 (34 days post-vaccination), he reported that "his shoulder has been sore ever since he got the flu shot at his last visit." Exhibit 2 at 19. Adding that he had started an exercise program approximately five days prior to vaccination, he described his pain as sharp – worse when reaching, lifting, and sleeping. *Id.* Upon examination, the PCP observed a painful arc past 90 degrees and limitation to 150 degrees of flexion and abduction. *Id.* at 21.

Petitioner returned for treatment eight days later - on December 12th. At that visit, he reported pain when reaching which would increase if he missed a dose of Ibuprofen which he was taking three times a day. Exhibit 2 at 24. Assessing Petitioner's flexion as ranging between 150 to 180 degrees, but painful, the PCP administered a cortisone injection and instructed Petitioner to begin a HEP. *Id.* at 25.

When seen by an orthopedic surgeon on February 15, 2019, Petitioner indicated that the "injection did provide significant relief [but] [i]n general, his symptoms have been unchanged." Exhibit 4 at 4. However, he also indicated that "[o]verall, he has been improved and his pain is down to 1 or 2." *Id.* at 5. Characterizing his pain as constant, dull, and sharp, Petitioner estimated the level of his current pain was one out of ten. He added, however, that it could increase to seven at its worst. *Id.* at 4. The orthopedic surgeon offered a PT referral which Petitioner declined and indicated he could discuss the possibility of surgery in the future if Petitioner's injury continued. *Id.* at 5.

On April 9th, Petitioner sought the opinion of a second orthopedic surgeon reporting that "[h]is pain has improved, but it is still constant." Exhibit 8 at 6. He added that he "was unable to do his normal workout routine" since vaccination. *Id.* Upon examination, he exhibited forward elevation to 170 degrees, external rotation of 70 degrees, internal rotation to T10, and normal strength. *Id.* at 7. After reviewing the results of Petitioner's January 23rd MRI which showed edema overlaying the humeral head compatible with a SIRVA injury, mild tendinopathy of the subscapularis tendon without rotator cuff tearing and a possible prior AC joint capsular strain, the orthopedic surgeon administered another

9

steroid injection. *Id.*; *see* Exhibit 6 at 8 (MRI results). The orthopedic surgeon indicated that Petitioner should return to the clinic to discuss surgical options if his symptoms did not improve. Exhibit 8 at 7.

When Petitioner returned on June 12th, he reported temporary relief from both cortisone injections – specifically two weeks of complete relief, but then a gradual return of pain, following the second injection. Exhibit 8 at 11. He underwent arthroscopic surgery, specifically debridement, subacromial decompression, and a complete bursectomy on June 24th. *Id.*; *see also* Exhibit 2 at 43.

From July 8th through September 18th, Petitioner attended 12 sessions of post-surgical PT. Exhibit 7 at 3-46; Exhibits 7, 9. By his last session, Petitioner reported no pain at rest, with activity, or while performing his exercises. Exhibit 9 at 3. He was told he could resume bowling but should hold off on any pull-ups for now. *Id.* In the discharge record from the next day, it was noted that Petitioner had made "[e]xcellent overall improvement" and had no pain or impairment. *Id.* at 4.

Petitioner maintains that his SIRVA injury continues to the present day, but there is a dearth of evidence supporting this assertion. Additionally, the record contains evidence that Petitioner's SIRVA injury was substantially resolved by his last PT session in 2019, and that his later symptoms may be more attributable to strenuous exercises/training and unrelated conditions.

Following his last PT session on September 18, 2019, Petitioner did not seek treatment again until June 2020, almost nine months later and two months after filing his petition. After comparing the results of Petitioner's earlier MRI which a second one performed at that time, his PCP noted the lack of edema at the humeral attachment which previously had been attributed to Petitioner's SIRVA injury. The PCP opined that Petitioner's SIRVA was markedly improve but "the other rotator cuff problems remain." Exhibit 13 at 6.

And, when providing histories for this later pain, Petitioner attributed it to recent increased activity. At an appointment on July 24, 2020, Petitioner indicated that "[h]is shoulder seemed to recover well after surgery, but he experienced recurrent symptoms less than 6 months later [in] December 2019 while training for Tough Mudder." Exhibit 14 at 7. He stated that "[h]e was performing pull-ups and push-ups, which resulted in increased anterior shoulder pain." *Id.* A few days later, on July 28th, he indicated he was "working on push-ups recently and noted mild soreness." Exhibit 15 at 17. He also indicated that "his shoulders have cracked for years when he moves" *Id.* Petitioner was

10

diagnosed with "[c]hronic left shoulder pain with scapular dyskinesis[13]." *Id.* at 9.

Given the lack of evidence establishing that Petitioner's later shoulder pain was due to his SIRVA injury, the comparable cases cited by Petitioner do not provide helpful comparisons. Many involved SIRVA injuries of a much longer duration and/or more severe levels of initial pain.[14] This does not characterize Petitioner's experience.

The SIRVA injury described by Petitioner is not reflective of the information found in the medical records in this case. Although Respondent's depiction is more accurate, there are a few instances when Respondent misstates some information. The first orthopedic surgeon seen by Petitioner did not opine that surgery was not necessary, only that more conservative treatment should be pursued initially. *Compare* Opp. at 8 *with* Exhibit 4 at 5. Additionally, Respondent characterized Petitioner's gap in treatment as lasting one year, when it was slightly less – nine months.

Although Respondent more accurately described Petitioner's SIRVA injury, there are some significant differences between two of the cases he proposed. The *Shelton* petitioner did not seek treatment for five months post-vaccination, and did not return for further treatment until an additional three months thereafter. *Shelton,* 2021 WL 2550093, at *7. Although the overall duration of the *Weed* petitioner's SIRVA injury was similar, she suffered more severe initial pain and underwent surgery approximately two months post-vaccination. *Weed,* 2021 WL 1711800, at *3-4. By contrast, the third case Respondent proposed, *Hunt,* is more similar. *Hunt,* 2022 WL 2826662, at *8-9. I awarded the *Hunt* petitioner $95,000.00 for her pain and suffering. *Id.* at *10.

However, I find the facts and circumstances suffered by Petitioner most closely mirrors those suffered by the petitioner in *Martin*, who received a pain and suffering award of $100,000.00. *Martin v. Sec'y of Health & Hum. Servs.,* No. 19-0380V, 2021 WL 2350004 (Fed. Cl. Spec. Mstr. May 5, 2021). The *Martin* petitioner's SIRVA injury also lasted approximately one year, involved only mild levels of pain and reduced ROM, and required surgery which produced a resolution of symptoms within five months thereafter.

---

[13] Scapular dyskinesis is "[t]he improper movement of the scapula during shoulder movement." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6701878/ (last visited on Sept. 6, 2022).

[14] *Nute v. Sec'y of Health & Hum. Servs.,* No. 18-0140V, 2019 WL 61250008, at *1-5 (Fed. Cl. Spec. Mstr. Sept. 6, 2019); *Rafferty v. Sec'y of Health & Hum. Servs.,* No. 17-1906V, 2020 WL 3495956, at *2-7 (Fed. Cl. Spec. Mstr. May 21, 2020). *Wallace v. Sec'y of Health & Hum. Servs.,* No. 16-1472V, 2019 WL 4458393, at *1-5 (Fed. Cl. Spec. Mstr. June 27, 2019); *Dobbins v. Sec'y of Health & Hum. Servs.,* No. 16-0854V, 2018 WL 4611267, at *2-8 (Fed. Cl. Spec. Mstr. Aug. 15, 2018); *Roberson v. Sec'y of Health & Hum. Servs.,* No. 19-0090V, 2020 WL 5512542, at *2-4 (Fed. Cl. Spec. Mstr. Aug. 7, 2020); *Stokes v. Sec'y of Health & Hum. Servs.,* No. 19-0752V, 2021 WL 6550888, at *2-4 (Fed. Cl. Spec. Mstr. Dec. 17, 2021); *Drake v. Sec'y of Health & Hum. Servs.,* No. 18-17476V, 2020 WL 4674105, at *2-3 (Fed. Cl. Spec. Mstr. July 7, 2020).

*Martin,* 2021 WL 2350004, at *3-4.

Thus, Petitioner should receive the same pain and suffering award as the *Martin* petitioner - making a pain and suffering award of $100,000.00 appropriate in this case.

### VI.     Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $100,00.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[15] I also find that Petitioner is entitled to $1,352.70 in actual expenses.**

Based on the record as a whole and arguments of the parties, **I award a lump sum payment of $101,352.70, representing compensation in the amounts of $100,000.00 for his actual pain and suffering and $1,352.70 for his actual unreimbursable expenses in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[16]

**IT IS SO ORDERED.**

                                                              <u>s/Brian H. Corcoran</u>
                                                              Brian H. Corcoran
                                                              Chief Special Master

---

[15] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.